# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## LEXINGTON DIVISION

### *ELECTRONICALLY FILED*

| | |
|---|---|
| HANNA ALBINA and AUSTIN WILLARD, individually and on behalf of others similarly situated, | CASE No.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| THE ALIERA COMPANIES, INC., TRINITY HEALTHSHARE, INC., and ONESHARE HEALTH, LLC d/b/a UNITY HEALTHSHARE, LLC, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

### I. PARTIES

1.      Plaintiff Hanna Albina is a citizen of Kentucky who resides in Lexington, Fayette County. Mr. Albina enrolled his family in a health care plan offered by The Aliera Companies, Inc., Trinity HealthShare, Inc. and/or OneShare Health, LLC d/b/a Unity HealthShare, LLC (collectively "Defendants") from August 1, 2018, through November 19, 2019.

2.      Plaintiff Austin Willard is a citizen of Kentucky who resides in Lexington, Fayette County. Mr. Willard enrolled his family in a health care plan offered by Defendants from March 15, 2018, through the present.

3.      Defendant The Aliera Companies, Inc. ("Aliera") is a Delaware corporation headquartered in Atlanta, Georgia. It is incorporated as a for-profit business, without any express religious affiliation. It changed its name in 2019 from Aliera Healthcare, Inc.

4.      Defendant Trinity HealthShare, Inc. ("Trinity") is a Delaware corporation headquartered in Atlanta, Georgia and purports to be a nonprofit entity. Trinity was incorporated on or about June 27, 2018.

5.      Defendant OneShare Health, LLC is a Virginia limited liability corporation. On information and belief, it is headquartered in Irving, Texas, and was previously headquartered in Atlanta, Georgia. OneShare Health, LLC was formerly known as Kingdom HealthShare Ministries, LLC, and before that as Unity HealthShare, LLC. Because the majority of the actions described in this Complaint occurred when OneShare Health, LLC was known as Unity HealthShare, LLC, it will be referred to as "Unity" in this Complaint. Unity is a subsidiary of Anabaptist Healthshare ("Anabaptist").

6.      Aliera created, marketed, sold, and administered insurance plans for Unity and was solely responsible for the development of plan designs, pricing, marketing materials, vendor management, recruitment and maintenance of a sales force, and administration of claims on behalf of Unity.

7.      Aliera markets, sells, and administers insurance plans for Trinity and is solely responsible for the development of plan designs, pricing, marketing materials, vendor management, and recruitment and maintenance of a sales force on behalf of Trinity.

8.      Neither Aliera, Trinity nor Unity holds or has held a certificate of authority from the Kentucky Department of Insurance as required by KRS 304.3-070 *et seq*, and neither Aliera, Trinity nor Unity has at any time been authorized to transact insurance in the Commonwealth of Kentucky. Aliera has been licensed as an agent to sell life and health insurance in Kentucky since September 19, 2017.

## II.  JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) and § 1367 because there is diversity of citizenship and the amount in controversy related to the proposed class claims exceeds $75,000.

10.     Alternatively, jurisdiction of this Court arises pursuant to 28 U.S.C. § 1332(d)(2) and § 1367 because there is diversity of citizenship, the proposed Class that Plaintiffs seek to represent consists of hundreds, if not thousands of individuals and, based on information and belief, the amount in controversy related to the proposed class claims exceeds $5,000,000.00.

11.     Venue is proper because some of the acts or omissions occurred in the Eastern District of Kentucky, and the named Plaintiffs and many of the proposed class members reside in this District.

### III.  NATURE OF THE CASE

12.     Defendants sold inherently unfair and deceptive health care plans to Kentucky residents, and failed to provide them with the coverage the purchasers believed they would receive. Despite referencing Aliera as "the new Blue Cross and Blue Shield," Defendants claimed the health care plans were "not insurance" in order to avoid both oversight by the Commonwealth of Kentucky's Insurance Commissioner and minimum requirements mandated by the Patient Protection and Affordable Care Act ("ACA"). At the same time, Defendants created the health care plans to look and feel like health insurance that would provide meaningful coverage for the purchasers' health care needs. In fact, regulators in at least 10 states have concluded the health care plans are "insurance." *See infra*, ¶ 72.

13.     When Congress passed the ACA in 2010, it required all individuals to be covered by health insurance or pay a penalty. Congress allowed for a handful of exceptions to that requirement, set out in 26 U.S.C. § 5000A. One of those exceptions was for members of existing Health Care Sharing Ministries ("HCSMs"). In order to qualify as an HCSM under the ACA, an entity must meet rigid requirements, including: (1) it must be recognized as a 501(c)(3) tax exempt organization; (2) its members must "share a common set of ethical or religious beliefs and share medical expenses among members according to those beliefs"; and (3) it must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have

been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(ii). At no time has for-profit Aliera ever met the definition of an HCSM.

14.     In an attempt to exploit the exception for HCSMs set out in 26 U.S.C. § 5000A, Aliera convinced Defendant Unity's parent, Anabaptist, to create defendant Unity as a sham HCSM in 2016. When Aliera's relationship with Anabaptist soured, Aliera created Defendant Trinity as a sham HCSM to replace Unity in 2018.

15.     Although Aliera and Unity repeatedly represented that Unity had been recognized as an HCSM, Unity did not meet the requirements of an HCSM under 26 U.S.C. § 5000A(d)(2)(B)(ii) because, for example, it was not in existence at all times since December 31, 1999, and it had no members before its creation in 2016. Unity and Aliera falsely claimed that Unity had been "recognized" as an HCSM based on recognition of Anabaptist as an HCSM, even though Anabaptist's recognition by the federal government pursuant to the ACA was based on service of a different religious community. In addition, Anabaptist is not Unity's "predecessor" because it is Unity's parent and continued to exist as a distinct entity after the creation of Unity as its subsidiary.

16.     Similarly, although Aliera and Trinity represented that Trinity had been "recognized" as an HCSM, Trinity did not meet the requirements of 26 U.S.C. § 5000A(d)(2)(B)(ii) because it was not in existence continuously since 1999, and because it did not require its members to adhere to the ethical and religious beliefs set out in its by-laws. It was never, and could not have been, "recognized" as an HCSM because the federal agency that had at one time provided letters of recognition stopped doing so in 2016, before Trinity was created.

17.     Aliera was authorized by Unity and then by Trinity to sell illegal health insurance plans to Kentucky residents, while representing those plans as originating from "recognized" HCSMs. Aliera sold, at the instance of Unity and Trinity, illegal health insurance plans to hundreds, if not thousands, of Kentucky residents. These plans did not comply with the minimum basic requirements for authorized health care plans under federal law, and have resulted in

Kentucky residents (1) paying for an illegal contract, and (2) being denied coverage for medical care required by law to be provided. Meanwhile, Defendants and their principals realized exorbitant profits. On information and belief, Aliera retained approximately 84% of all payments made by Kentucky residents who purchased the illegal health insurance plans from Aliera.

18.     Defendants represented that the insurance plans sold by Aliera were HCSM plans and would provide members with meaningful medical coverage. These statements made by Defendants were fraudulent, misleading, unfair, and/or deceptive in violation of the unfair competition provision of Kentucky's Insurance Code, False Advertising Law, and Unfair Claims Settlement Practices Act. At no relevant time did the Defendants' plans meet the requirements for HCSMs under federal law (despite their representations to the contrary), meet the requirements of health insurance plans under federal law, or provide the medical coverage that was represented.

19.     Defendants have breached their fiduciary duties to class members and have been unjustly enriched by collecting unreasonable fees and commissions, while arbitrarily and unreasonably refusing to pay class members' medical claims. Defendants have profited from payments that class members made believing, based on Defendants' misrepresentations, that the insurance sold by Aliera would cover class members' medical expenses.

20.     Plaintiffs, on behalf of themselves and the class they seek to represent, seek declaratory and injunctive relief to prevent Defendants from continuing to arbitrarily, and in bad faith, deny or delay payment of claims that should be covered under legitimate health insurance plans. On behalf of themselves and the proposed class, Plaintiffs also seek either rescission of their insurance plans and return of premiums paid, or reformation of those plans to provide coverage for uncovered health care expenses that should have been paid (had the plans sold been authorized and legal rather than sham health insurance plans). Finally, Plaintiffs, on behalf of themselves and the class they seek to represent, seek disgorgement, imposition of a constructive trust, and/or restitution of Defendants' unlawful profits.

## IV.  CLASS ALLEGATIONS

21.     ***Definition of Class:*** Pursuant to Fed. R. Civ. P. 23, Plaintiffs brings this action on behalf of themselves and all persons similarly situated. The proposed Class is defined as follows:

> All persons who, while a Kentucky resident, purchased or were covered by a plan from Aliera and either Unity HealthShare LLC or Trinity HealthShare, Inc. that purported to be a "health care sharing ministry."

22.     ***Size of the Class:*** The Plaintiffs' proposed class is so numerous that joinder of all members is impracticable. On information and belief, hundreds or thousands of individuals in Kentucky are or have been covered by one or more of Defendants' plans.

23.     ***Common Questions of Fact and Law:*** There are questions of law and fact that are common to all class members including: (1) whether the health care products that the Defendants created, marketed, sold, and administered to class members met the legal requirements of an HCSM under 26 U.S.C. § 5000A; (2) whether plans sold qualified as "insurance" under Kentucky law, including KRS 304.1-030; (3) whether Kentucky law and regulations forbid the creation, marketing, sale, and administration of health care products in the "business of insurance" without authorization or other legal exception; (4) whether Defendants failed to obtain proper authorization for the creation, marketing, sale, and administration of an insurance product in Kentucky; (5) whether class members are entitled to (a) rescission of the plan(s) and refunds of all premiums paid and/or (b) reformation of the plans to comply with the minimum insurance coverage requirements of Kentucky and federal law, and re-processing of all claims for expenses and costs incurred that would have been covered had the plan(s) properly complied with those laws; (6) whether Defendants' actions were unfair, deceptive, untrue or misleading, and likely to deceive consumers, in violation of the unfair competition provision of Kentucky's Insurance Code, False Advertising Law, and Unfair Claims Settlement Practices Act; (7) whether Defendants owed a fiduciary duty to their members, and whether they breached that fiduciary duty; (8) whether Defendants have been unjustly enriched by collecting members' payments

while failing to pay claims, and by paying themselves unreasonable fees and commissions; (9) whether a constructive trust should be imposed; and (10) whether class members are entitled to other relief resulting from Defendants' unfair and/or deceptive acts.

24.     ***Class Representative:*** The claims of the named Plaintiffs are typical of the claims of the proposed class as a whole resulting from Defendants' sale of unauthorized and illegal insurance plans. The named Plaintiffs will fairly represent and adequately protect the interests of class members because they have been subjected to the same practices as other class members and suffered similar injuries. The named Plaintiffs do not have interests antagonistic to those of other class members as to the issues in this lawsuit.

25.     ***Separate Suits Would Create Risk of Varying Conduct Requirements***. The prosecution of separate actions by class members against Defendants would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct. Certification is therefore proper under Fed. R. Civ. P. 23(b)(1).

26.     ***Defendants Have Acted on Grounds Generally Applicable to the Class.*** Defendants have uniformly created, marketed, approved, sold, and/or administered unauthorized health insurance plans in Kentucky. They have misrepresented the plans as HCSM plans under federal law. Defendants have acted on grounds generally applicable to the proposed class, rendering declaratory and injunctive relief appropriate respecting the whole class. Certification is therefore proper under Fed. R. Civ. P. 23(b)(2).

27.     ***Questions of Law and Fact Common to the Class Predominate Over Individual Issues.*** The claims of the individual class members are most efficiently adjudicated on a class-wide basis. Any interest that individual members of the class may have in individually controlling the prosecution of separate actions is outweighed by the efficiency of the class action mechanism. Upon information and belief, no class action suit is presently filed or pending against Defendants in Kentucky for the relief requested in this action. Issues as to Defendants' conduct in applying

standard marketing, sales, and administration practices towards all members of the class predominate over questions, if any, unique to members of the class. Certification is therefore additionally proper under Fed. R. Civ. P. 23(b)(3).

28.     *Venue*. This action can be most efficiently prosecuted as a class action in this jurisdiction, where Defendants do business and where Plaintiffs reside.

29.     *Class Counsel*. Named Plaintiffs have retained experienced and competent class counsel.

## V.  FACTUAL BACKGROUND

### A.     Aliera Seeks Out an HCSM to Avoid Insurance Requirements, and Sells Sham HCSM Products through Unity

30.     Defendant Aliera was incorporated in the State of Delaware by Timothy Moses, his wife Shelley Steele, and their son Chase Moses, in December 2015. Before forming Aliera, Timothy Moses was the president and CEO of International BioChemical Industries, Inc., a company that declared bankruptcy in 2004 after he was charged with felony securities fraud and perjury. As a result of the case, titled *United States v. Moses*, 1:04-cr-00508-CAP-JMF (N.D. Ga.), Moses was sentenced to over 6 years in prison and ordered to pay $1.65 million in restitution. Moses's supervised release from his conviction was terminated in April 2015.

31.     Aliera is a for-profit entity. Its stated scope of business is "to engage in the business of providing all models of Health Care to the general public" and "to cultivate, generate or otherwise engage in the development of ideas or other businesses, to buy, own or acquire other businesses, to market and in any way improve the commercial application to the betterment and pecuniary gain of the corporation and its stockholders . . . ." The formation documents of Aliera Healthcare, Inc. do not include any discussion of religious or ethical purposes or missions.

32.     Aliera began selling its health care products in late 2015, less than a year after the termination of Timothy Moses's supervised release. At the time it was formed, Aliera only sold "direct primary care medical home" ("DPCMH") plans. DCPMH plans generally cover limited

services such as some doctors' visits and basic lab services. These plans provide no hospitalization or emergency room coverage and are not ACA-complaint.

33.     Aliera realized that it could greatly increase the sales of its health care products if it could take advantage of the federal statute that exempted taxpayers who purchased HCSMs from the ACA's individual mandate.

34.     Non-party Anabaptist was a small Mennonite entity located in Virginia with about 200 members. Anabaptist had been recognized by the federal Department of Health & Human Services' Centers for Medicare & Medicaid Services ("CMS") as an HCSM.

35.     In 2016, Timothy Moses convinced Anabaptist to permit Aliera to market its own DCPMH plan "side by side" with a purported HCSM offered by a new subsidiary to be incorporated by Anabaptist, using Anabaptist's HCSM designation. Anabaptist subsequently incorporated Unity for that purpose. Under the proposal, Aliera would market both its own plan and Unity's purported HCSM together as a health care product it claimed would be exempt from the ACA's mandates.

36.     Aliera entered into a contract with Unity on or about February 1, 2017. Under that contract, Aliera would offer its own health products to the public that did not meet coverage requirements under the ACA and did not independently qualify for the HCSM exemption under 26 U.S.C. § 5000A. In return, Aliera's customers would join Unity, which claimed to be an HCSM, providing revenue to Unity and its parent Anabaptist. Two of Anabaptist's principals would also receive, as a "profit-sharing arrangement" with Aliera, a payment from each member's monthly contribution, and these individuals were paid approximately $1.4 million by the end of 2018 under this arrangement.

37.     Although Aliera marketed the plans to consumers throughout the country as HCSM plans through Unity, in reality Unity was merely a shell company claiming an HCSM designation. Unity delegated all authority and responsibility to Aliera to create, design, market, and administer products sold under the Unity name. Thus, Aliera, a for-profit entity that was never

an HCSM, could push its own DCPMH plans, while also simultaneously designing, marketing, selling, administering, controlling, and profiting from the Unity HCSM plans. For example:

(a)   All member payments were paid directly to Aliera.

(b)   The purported "sharing" component of the HCSM was delegated to Aliera.

(c)   Aliera handled all member claims for health care coverage.

(d)   Aliera served as the program administrator for the Unity HCSM plans.

(e)   Members interfaced only with Aliera, not Unity.

(f)   Aliera personnel made the final decision whether a claim would be paid.

(g)   Aliera controlled the Unity member list.

(h)   Aliera developed all plans and programs for the HCSM component of the Aliera products

(i)   Aliera controlled the Unity website.

(j)   All those who purchased the Unity products became members of both Aliera and Unity.

38.   In selling the Unity-branded products, Aliera did not require members to attest to any common religious belief. It required only an agreement to adhere to generic spiritual and ethical beliefs that "personal rights and liberties originate from God," "every individual has a fundamental right to worship God in his or her own way," there is a moral obligation "to assist our fellow man when they are in need," there is a duty to "maintain a healthy lifestyle," and there is a "fundamental right of conscience to direct [one's] own healthcare." *See* Appendix A, at 9-10.[1]

---

[1] Appendices to this complaint are attached in PDF format. For the sake of convenience, page numbers correspond to the pages of the PDF document on which the cited text appears even where the document may have its own separate pagination. For example, for this citation to Appendix A, the relevant text appears on pages 9-10 of the PDF attached as Appendix A, and those numbers are provided in the citation even though the quoted text is from pages 13-14 of the booklet that was scanned to create Appendix A.

39.     On October 24, 2018, Aliera registered to do business in the Commonwealth of Kentucky. On September 19, 2017, Aliera was granted licenses to sell Life Insurance and Health Insurance by the Kentucky Insurance Commissioner. On information and belief, Aliera began selling its health plans to Kentucky residents prior to both dates, claiming the plans were exempt from the ACA because of the Unity affiliation.

40.     Despite the claims made by Aliera in marketing its own products side-by-side with Unity's purported HCSM offerings, Unity could not qualify as an HCSM because it was created after December 31, 1999, and had no members when it was created. In order to qualify as an HCSM under federal law, the entity or a predecessor of the entity must, among other requirements, have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(IV). Unity has not had members who have shared medical expenses "continuously and without interruptions since at least December 31, 1999," and it had no predecessor entity.

41.     In addition, in order to qualify as an HCSM under federal law, the members of the entity must "share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs . . . ." 26 U.S.C. § 5000A(d)(2)(B)(III).

42.     Similarly, to qualify for an exception from Kentucky insurance regulations, "a nonprofit religious organization" must satisfy the following criteria:

(1)     It must limit its participants to "members of the same denomination or religion";

(2)     It must "match[] its participants who have financial, physical, or medical needs with participants who choose to assist with those needs";

(3)     It must "suggest[] amounts to give that are voluntary among the participants, with no assumption of risk or promise to pay either among the participants or between the participants and the organization"; and

(4)   It must provide participants with a specific Notice about these requirements that participants must acknowledge by signing beneath it on any applications.

KRS 304.1-120(7).

43.   Despite its status as a subsidiary of Anabaptist, Unity has never restricted its membership to those individuals who affirm a specific set of common religious beliefs or who are members of "the same denomination or religion." Instead, the statement of beliefs provided to members is general enough that members of many religions and denominations could agree to them. Appendix A, at 9-10. Indeed, Mr. Albina's insurance agent directed Mr. Albina to Aliera in 2018 after Mr. Albina was unable to agree to the much more specific statement of beliefs and ministerial certifications required by another HCSM.

44.   In addition, during the period it partnered with Aliera, Unity never had a process for "[m]atch[ing] its participants who have financial, physical, or medical needs with participants who choose to assist with those needs," nor did it treat the monthly contributions required of participants as "[s]uggest[ed] amounts to give that are voluntary among the participants" as required by KRS 304.1-120(7). It also did not provide participants with the specific Notice set out in KRS 304.1-120(7).

45.   As a result, the healthcare plans marketed under Unity's name that Aliera designed, marketed, administered and controlled, and sold to Kentucky residents were sham HCSM plans not exempt from the ACA.

**B.      After Aliera's Relationship with Unity Soured, Aliera Created Trinity, a Sham HCSM, Converted the Unity Products to Trinity Products, and Continued to Sell to Kentucky Consumers through Trinity**

46.   In 2018, after thousands of Aliera/Unity plans had been sold nationwide, Anabaptist/Unity discovered that, among other nefarious conduct, Timothy Moses had written himself approximately $150,000 worth of checks from Unity funds without board approval, and had not properly maintained assets for payment of benefits to members. Unity terminated the relationship with Aliera in summer 2018.

47.     After its relationship with Unity terminated, Aliera would have no affiliation with any HCSM. Therefore, Aliera and its principals created Defendant Trinity on June 27, 2018 as a purported nonprofit entity. William "Rip" Theede, III became the CEO of Trinity. Mr. Theede is a former Aliera employee. He is also a close family friend of the Moses family and even officiated at Chase Moses's wedding.

48.     As with Unity, Trinity could not qualify as an HCSM because it was created after December 31, 1999, and had no members when it was created. In order to qualify as an HCSM under federal law, the entity or a predecessor of the entity must, among other requirements, have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(IV). Trinity has not had members who have shared medical expenses "continuously and without interruptions since at least December 31, 1999," and it had no predecessor entity.

49.     In addition, Trinity also could not qualify as an HCSM under federal law, 26 U.S.C. § 5000A(d)(2)(B)(III), or satisfy the religious exception to Kentucky's Insurance Code. KRS 304.1-120(7).

50.     Although Trinity's bylaws set forth a specific set of religious beliefs, it has never restricted its membership to those individuals who affirm the specific common religious beliefs or who are members of "the same denomination or religion." Instead, it has continued to use the identical set of generic spiritual and ethical "beliefs" that Aliera had devised for the Unity plans. Appendix B, at 12. Indeed, Aliera represents that Trinity "welcomes members of all faiths." Appendix D, at 12.

51.     In addition, Trinity never had a process for "[m]atch[ing] its participants who have financial, physical, or medical needs with participants who choose to assist with those needs," nor did it treat the monthly contributions required of participants as "[s]uggest[ed] amounts to

- 13 -

give that are voluntary among the participants" as required by KRS 304.1-120(7). It also did not provide participants with the specific notice set out in KRS 304.1-120(7).

52.     Defendants represent that Trinity is "recognized" as a qualified HCSM. It was, in fact, impossible for Trinity to be "recognized" as such because the rule that provided such recognition was eliminated years before Trinity was even created. In 2013, the United States Department of Health and Human Services ("HHS") promulgated a rule under which it certified HCSMs by issuing a certificate of exemption to the entity. However, the rule was eliminated in 2016. *See* 81 Fed. Reg. 12281 (final rule eliminates the issuance of exemptions for HCSMs). Trinity has never appeared on any list of recognized HCSMs developed by HHS.

53.     Likewise, the Internal Revenue Service ("IRS") does not and has never undertaken to determine whether any entity is qualified as an HCSM. Its role is limited to accepting tax returns from individuals who may claim that they are entitled to an HCSM exemption on their individual tax returns. Individual members, in turn, rely on the plan provider to notify them whether their plan qualifies as a legitimate HCSM. The IRS has never recognized Defendants as a qualified HCSM under 26 U.S.C. § 5000A(d)(2)(B). Defendants' representations to the contrary are false and misleading.

54.     On or about August 13, 2018, Aliera signed an agreement with Trinity to provide the marketing, sale, and administration of purported HCSM plans. The contract allowed Aliera to use Trinity's non-profit status to sell health care plans purporting to be HCSM plans, while keeping complete control over the money, the administration of the plans and benefits paid, and the membership roster. The agreement provides that all member "contribution" payments are made directly to Aliera, which then allocates 30-40% (depending on the plan) of every payment as commissions, and that Aliera will be paid substantial additional administrative fees. The agreement provides that, for the AlieraCare plan purchased by Plaintiffs, only about 15.5% of the members' contributions are actually placed into a Trinity "ShareBox" account for payment of claims. Appendix C, at 14-17.

55.     Many of the plans that Aliera had sold through the Unity brand, including those sold to the Plaintiffs, were transferred to the Trinity brand, and pending medical claims were transferred to Trinity. Aliera advised members that their historical claims, time spent on the plan, and payments toward their deductible would carry over to the Trinity plan. Throughout the period in which Aliera sold either Unity or Trinity plans purporting to be HCSMs to Kentucky residents, Aliera maintained total control of the sales of the plans, the member lists, the claims, and the claims administration, and Aliera commingled the funds of those members in an account or accounts it controlled.

**C.     Aliera Creates, Markets, Sells, and Administers Health Insurance**

56.     Plaintiffs and members of the proposed class have been, are, or will be enrolled in health care insurance plans, as defined by KRS 304.1-030, which were created, marketed, sold, and administered by Aliera through either Unity and/or Trinity.

57.     The terminology Defendants use in connection with these plans is directly analogous to terminology health insurers routinely use, and the plans are designed to look and feel like a health insurance policy. For example:

(a)     The health care plans marketed, sold, and administered by Aliera charge "members" a "monthly contribution" to participate. Defendants explicitly described those "contributions" as "premiums." *See, e.g.,* Appendix D, at 4-5*.* The amount of the premium or "contribution" charged is based on the plan selected by the insured. *Id.* at 2.

(b)     The plans require a member to pay a deductible, which Defendants call a "Member Shared Responsibility Amount," or "MSRA." *Id.* at 5. The higher a member's MSRA, the lower the member's "contribution."

(c)     Once the MSRA has been paid, medical bills are paid in accordance with a benefits booklet or "Member Guide" for the selected program. These benefit booklets contain the "membership instructions" which detail the "eligible medical expenses,"

"limits of sharing," and exclusions. *See* Appendix A; Appendix B. Individual plan members have no input into or control over the disposition of any sharing payments.

(d)     The plans require pre-authorization for certain non-emergency surgeries, procedures, or tests, as well as for certain types of cancer treatments. *See, e.g.,* Appendix A*,* at 12; Appendix B, at 18.

(e)     Defendants offer different health plans, with different levels of coverage, including "Interim," "Catastrophic," "Basic" or "Standard," and "Comprehensive." *See* Appendix D*,* at 4-5. The amount members are expected to pay depends on the plan chosen.

(f)     The standard and comprehensive plans are offered at different benefit levels. "Standard" is offered at "Value," "Plus" and "Premium" levels. "Comprehensive" is offered at "Bronze," "Silver," and "Gold" levels. The plans at the higher levels charge more and therefore claim to provide more robust benefits for covered medical conditions. *Id.* at 21-26. The plans charge more for smokers and charge more as the members' ages increase. Appendix E, at 3-4.

(g)     The plans may require members to pay a "co-expense," analogous to a "copay." Appendix D, at 5.

(h)     As with traditional health insurance, the plans provide for "maximum out-of-pocket" expenses. Id.

58.     The plans provide coverage for medical expenses. Among other things, the plans claim to provide coverage for preventive care, primary care, urgent care, labs and diagnostics, x-rays, prescription benefits, specialty care, surgery, and emergency room services. Appendix A*,* at 15-18; Appendix B, at 19-20.

59.     The plans purport to have established preferred provider networks ("PPOs").

60.     The plans contain exclusions and lifetime limits, including a lower lifetime limit for cancer treatment.

61.     The plans provide for payments directly to health care providers on behalf of members who are current on their monthly premiums in the event they experience a covered loss, have met their deductible or MSRA, and otherwise meet the coverage requirements set forth in the Member Guides. These payments are expressly contingent upon the occurrence of a covered medical need by the participating member.

62.     Like insureds in traditional health plans, members receive an "Explanation of Benefits (EOB)" when a claim is submitted. The EOBs are substantially similar in look and form to EOBs received from traditional health plans. *See* Appendix F; Appendix G; Appendix H; Appendix I.

63.     Although Defendants claim that they administer "voluntary sharing of healthcare needs for qualifying members," Appendix A, at 8, Appendix B, at 10, there is nothing voluntary about the insurance plans Defendants market, sell, and administer. Payment from the program upon the occurrence of a covered loss is determined exclusively by Defendants, purportedly according to the terms in the Member Guide. Members do not decide who gets paid benefits. For example, according to the Trinity Member Guide, members must accept Trinity's adjudication of benefits: "The contributors instruct [Trinity] to share clearing house funds in accordance with the membership instructions . . . . By participation in the membership, the member accepts these conditions." Appendix A at 10. The members, however, have no input into the "membership instructions." The Trinity Member Guide provides that Trinity (and not the members) is the "final authority for the interpretation" of the membership instructions, and Trinity directs payment to providers on behalf of members who have submitted medical claims that are covered under the benefits booklet. *Id.* The Unity Member Guide contains largely identical language as the Trinity Member Guide. *See* Appendix B, at 10.

64.     Members' "contributions" (*i.e.*, premiums) are not refundable. Although the member "contributions" are called "voluntary," if members fail to make the premium payment, they are not entitled to coverage for medical expenses. Appendix A, at 9; Appendix B, at 10-11.

65.     Defendants expressly represent that the health programs "provide members with options that look and feel like more traditional health care plans but at a fraction of the price." Appendix D, at 26. Defendants explain that the reason the plans are cheaper is that they are "based on cost sharing . . . . The trade-off is the member shared responsibility (MSRA) [*i.e.*, the deductible] is high." *Id*.

66.     The plans Defendants will sell or have sold are contracts whereby they undertook "to pay or indemnify another as to loss from certain specified contingencies or perils," or "to pay or grant a specified amount or determinable benefit or annuity in connection with ascertainable risk contingencies," and thus are insurance under KRS 304.1-030. Consequently, Defendants are required to comply with Kentucky and federal law governing health insurers and producers.

**D.      The Health Insurance Plans Defendants Create, Market, Sell, and Administer Are Illegal**

67.     None of the Defendants has a certificate of authority as required pursuant to KRS 304.11-030 to issue insurance within the Commonwealth of Kentucky, and none of the Defendants are authorized insurers under Kentucky law. Each of Defendants have issued illegal and unauthorized insurance products to Plaintiffs and other members of the class.

68.     Defendants' plans are not ACA-compliant because they do not meet the minimum coverage requirements or Essential Health Benefits required under the ACA. For example:

(a)     The plans impose a 24-month waiting period on coverage for, or significantly limit benefits for, preexisting conditions, which is illegal under the ACA. *See* 42 U.S.C. § 300gg-3.

(b)     The plans do not comply with the Mental Health Parity Act,

(c)     The plans impose lifetime caps.

69.     The Member Guide, which has never been reviewed or approved by the Kentucky Department of Insurance, HHS, or any other regulatory agency, contains inconsistent and contradictory coverage terms and conditions. For example:

(a)      The Member Guide provides the amounts and types of benefits that are covered, but then suggests Defendants are not required to pay any benefits whatsoever, and provides members with no basis to enforce Defendants' promises, even after the members have paid all required "contributions."

(b)      The Member Guide states the plan is an "opportunity for members to care for one another in a time of need, [and] to present their medical needs to other members," but in fact Defendants—like an insurance carrier—make all coverage decisions without ever presenting one member's needs to other members.

(c)      Defendants assert that over 1,000,000 providers are in their Preferred Provider Network, and provide lists of in-network preferred providers whose claims they will pay, but then assert providers are not on the list provided.

70.      Defendants have never maintained the 80% medical loss ratio of medical expenses paid to premiums received required by the ACA. 42 U.S.C. § 300gg-18.

71.      Defendants' plans at various times have purported to require multiple levels of appeal in violation of 42 U.S.C. § 300gg-19(a)(2)(b) and 45 C.F.R. §147.136(b)(3)(G), and at some times have required submission of disputes to binding arbitration, which is not permitted in insurance policies pursuant to KRS 417.050.

**E.      Multiple Other States Have Found that Aliera and Trinity Are Illegally Marketing, Selling, and Administering Insurance Products That Do Not Qualify as HCSMs**

72.      Multiple other states have taken action against Aliera and Trinity.[2] Those states include:

---

[2] In order to reduce the burden associated with submitting a number of additional appendices with this complaint, the Plaintiffs have posted the documents discussed below online and they can be accessed by visiting the following link: http://www.symslaw.com/aliera-and-trinity-litigation/stateregulation.

(a)     ***Texas.*** The Texas Attorney General filed suit against Aliera, claiming it engaged in the business of insurance without a license, and the court entered a Temporary Restraining Order on July 12, 2019, prohibiting it from accepting new customers in Texas. Aliera later agreed to accept no new customers in Texas during the pendency of the lawsuit.

(b)     ***Washington.*** The Insurance Commissioner entered cease and desist orders against Aliera and Trinity on May 3, 2019, finding Aliera acted as an unlicensed health care service contractor and Trinity was not an HCSM. Trinity entered into a consent order on December 30, 2019, agreeing not to enroll any new Washington residents, and to pay a $150,000 fine. On March 31, 2020, the Insurance Commissioner found that Unity, now known as OneShare, was not a legitimate HCSM and was acting as an unauthorized insurer in the state of Washington. It issued a cease and desist order prohibiting it from continuing to solicit or sell insurance in Washington. On May 5, 2020, a Washington Administrative Law Judge denied a motion to stay the order, citing sufficient prima facie evidence that OneShare was unlawfully transacting in insurance and did not qualify as an HCSM. On November 13, 2020, an administrative law judge conclusively held that Aliera had sold unauthorized insurance, and on November 24, 2020, the Insurance Commissioner imposed a $1,000,000 fine on Aliera.

(c)     ***Colorado***. The Colorado Division of Insurance found Defendants unlawfully sold insurance products and issued cease and desist orders on August 12, 2019. Final Agency Orders dated January 17, 2020, prohibit Aliera from selling the plans in Colorado, and prohibit Trinity from doing business in Colorado.

(d)     ***New Hampshire.*** The Insurance Commissioner entered a Cease and Desist Order on October 30, 2019, against Aliera and Trinity, prohibiting the sale or renewal of illegal health insurance in New Hampshire.

(e)  **Connecticut.** The Insurance Commissioner issued a Cease and Desist Order on December 2, 2019, against Aliera and Trinity, finding they were acting as insurers in Connecticut without a certificate of authority

(f)  **Maryland.** On February 27, 2020, the Insurance Commissioner entered an Order revoking Aliera's insurance producer license because it violated a 2018 consent order not to solicit membership in unauthorized insurance plans.

(g)  **California.** On March 8, 2020, the Insurance Commissioner of the State of California issued a Cease and Desist Order against Aliera and Trinity, based on the Commissioner's findings that they were acting as insurers in that state without a certificate of authority, and did not meet the definition of an HCSM.

(h)  **Iowa.** On July 7, 2020, the Iowa Insurance Division filed charges against Aliera, Trinity, and others, alleging they were selling insurance contracts in violation Iowa law, and misleading consumers.

(i)  **New York**. On October 20, 2020, the New York State Department of Financial Services filed charges against Aliera and Trinity stating the products they sold were insurance and accusing them of engaging in fraudulent and deceptive conduct.

(j)  **New Mexico**. On November 17, 2020, a hearing officer for the New Mexico Office of Superintendent of Insurance found the Trinity plans were illegal insurance and recommended a fine of $2,680,000 against Trinity, or in the alternative, that Trinity refund all contributions received from members in that state.

**F.    Plaintiffs Were Sold Sham Products by Defendants That Did Not Provide the Benefits Promised**

<u>**Plaintiff Hanna Albina**</u>

73.    Plaintiff Hanna Albina enrolled his family in an AlieraCare PLUS – Family plan on or about July 19, 2018, while Aliera was selling Unity plans in Kentucky.

74.    Before Mr. Albina enrolled his family in the plan, his insurance agent informed him that the plan was similar to a BlueCross-BlueShield insurance plan, but cheaper.

75.     Before recommending the Aliera plan to Mr. Albina, his agent first suggested he consider a plan from an HCSM company called Medi-Share because it would be cheaper than the insurance plans available on the ACA exchange and provide a nationwide provider network and while also providing a legal exemption to the ACA's individual mandate. Once Mr. Albina began the application process with Medi-Share, he determined he did not want to complete the application because it required extensive information about his family's religious practices and certification by his minister. He then asked his insurance agent if there were any other options, and his agent informed him there was a similar product sold by Aliera that did not require a detailed religious certification or as specific a statement of beliefs as other HCSMs.

76.     Mr. Albina reviewed the Aliera application and decided to purchase the coverage once he saw that it did not require an extensive religious certification or a statement of commitment to a particular faith or set of specific religious beliefs.

77.     Prior to purchasing coverage, Mr. Albina also reviewed Aliera's website to ascertain whether the existing providers he and his family members utilized participated in Aliera's provider network, and Mr. Albina relied on Aliera's representation that those providers were "in-network" before purchasing Aliera coverage. The purported benefits of obtaining care from an in-network provider included acceptance of Aliera coverage by the provider, provider submission of charges to Aliera, and a pre-negotiated discounted rate for out-of-pocket medical costs for Aliera customers. Mr. Albina was not provided with a copy of the Aliera Member Guide prior to his enrollment.

78.     The membership effective date for Mr. Albina and his family was August 1, 2018, and he received what he and his family believed was an insurance card showing his family had hospital, in-patient, out-patient, emergency room, specialty visit, preventive, and X-ray and imaging coverage, with certain co-pays and a $5,000 MSRA. Appendix J.

79.     He received a Member Guide from Aliera/Unity after he became a member. Appendix K. He did not receive the Member Guide before enrolling.

80.     Prior to his enrollment, Mr. Albina was not provided with any notice indicating that he would be obligated to arbitrate disputes.

81.     On or about April 26, 2019, an email from Aliera, for itself and as agent for Trinity, informed Mr. Albina that it was "no longer selling your current health care plan with a Unity HealthShare, LLC component," but "[w]e do have a new Aliera plan available through our alliance with Trinity HealthShare that offers the same plan services and benefits." Appendix L. This email offered a free month of coverage for switching to Trinity and specified that his monthly premium would remain $757.27, consisting of a rate of $757.27 per month for "AlieraCare PLUS - Family" and $0.00 per month for "Trinity HealthShare PLUS - Family." *Id*. In addition, Aliera, for itself and as agent for Trinity, led the Albinas to believe that existing claims would transfer to and be assumed by Trinity by representing that "[a]ll services [would] remain the same" and "all Medical history and historical claims" would "continue to track" after the Albinas' plan was transferred to Aliera/Trinity. *Id.*

82.     In May 2019, Mr. Albina received a number of communications urging him to switch to Trinity and Mr. Albina called Aliera directly to inquire about his options. At this point, the Aliera agent gave him the impression that he had no choice but to switch to Trinity and walked him through the process. At no point was there any mention of arbitration, nor did Mr. Albina receive a written notice that switching to Trinity would result in him being required to arbitrate disputes.

83.     The Albinas received a new Member Guide that purported to be from Aliera and Trinity. Appendix M.

84.     Mr. Albina paid $757.27 per month for his family's AlieraCare PLUS – Family plan while Aliera partnered with Unity, and $757.27 per month for their AlieraCare PLUS – Family plan while it partnered with Trinity.

85.     By the time Aliera asked Mr. Albina to switch his family's coverage from Unity to Trinity in the spring of 2019, the Albina family was already experiencing serious problems

with their Aliera coverage. The problems were so bad that Mr. Albina asked his insurance agent if he could switch to a BlueCross-BlueShield plan for his family instead of switching to Trinity, but he was told he could not because Aliera is not ACA-compliant and, as a result, a change to his Aliera plan does not create a "Qualifying Life Event" that would permit him to purchase a new health insurance plan on the ACA exchange outside of the open enrollment window, which would not reopen until the end of the year.

86.     On or about April 30, 2019, Mr. Albina raised the serious issues he was having with a "Help Desk Associate" at Aliera. In particular, he stated that his wife had checked Aliera's website in order to choose doctors who were in-network but then their offices would say they did not participate in Aliera's network when she sought care from them. As a result, he stated that he was left paying all the bills out-of-pocket. In addition, providers would not submit bills to Aliera and the payments he made out-of-pocket were not applied by Aliera to reduce his family's deductible (or MSRA).

87.     At this time, Mr. Albina and his insurance agent began a lengthy process of collecting claim forms from his family's doctors and submitting them to Aliera directly. Even after these submissions, almost none of the claims were paid by Aliera or applied to the MSRA.

88.     Among the claims that Aliera refused to pay were visits for primary and specialty care, including visits by Mr. Albina's children to their pediatrician, dermatology visits by Mr. Albina's wife, and visits by his children to an allergist.

89.     Having determined Aliera was a fraud based on its refusal to properly process his family's claims despite repeated efforts over a period of months, by the fall of 2019 Mr. Albina had given up on seeking further redress from Aliera or Trinity.

90.     Because Mr. Albina and his family had learned they would not receive a negotiated rate from any of their providers if they tried to use their Aliera plan and, further, had no faith that Aliera would pay any claims, they began to postpone and forego medical care that they otherwise would have sought.

91.     On October 18, 2019, Mr. Albina received a notice from the receiver for the Unity HCSM plans appointed in the litigation between Aliera and Unity in Georgia. This notice informed him that his family's health care plan with Unity would terminate on November 18, 2019. However, Mr. Albina had begun receiving Explanations of Benefits from Aliera Healthcare that prominently displayed the Trinity HealthShare logo, beginning no later than February 2019. During the November 2019 open enrollment window, Mr. Albina enrolled his family in a health insurance plan from the ACA exchange, and it took effect on January 1, 2020.

92.     At no point was Mr. Albina asked to "share" his "contributions" (monthly premium payments) to pay for other members' needs, nor was he told that any other members had agreed to "share" their "contribution" with him or his family.

93.     The AlieraCare PLUS – Family plan sold to the Albinas constitutes insurance under Kentucky law. However, the plan failed to comply with Kentucky and federal law in its provision of benefits and falsely stated that it was "not insurance."

94.     Mr. Albina and his family have suffered damages by paying for the Unity plan and Trinity plans, which are both illegal insurance products, and by being denied health care coverage for their needed medical expenses.

**Plaintiff Austin Willard**

95.     Plaintiff Austin Willard enrolled his family in an AlieraCare Premium 5000 plan on or about February 26, 2018, while Aliera was selling Unity plans. He paid $125 in application fees to enroll in the plan.

96.     Mr. Willard had learned about the Medi-Share HCSM while he worked for a Christian ministry called Campus Outreach. After he left his job and started his own business, he needed to find new health insurance coverage for his family and discovered Aliera after running a Google search for Medi-Share.

97.     After contacting an insurance agent and reviewing information about Aliera, Mr. Willard believed Aliera would provide coverage for health care in a manner similar to traditional

health insurance, except that Aliera plans would not cover pre-existing conditions for 24 months. This issue was material to Mr. Willard because he suffers from a pre-existing neurological condition that requires periodic treatment by a neurologist, including injections that must be performed in a physician's office four times a year. Mr. Willard disclosed this pre-existing condition to Aliera at the time of his application.

98.     Because Aliera plans were cheaper than the insurance policies on the ACA exchange, Mr. Willard decided to sign up for an Aliera plan despite the 24-month waiting period for pre-existing conditions. He saw the premiums he would pay during the waiting period as an investment in having a cheaper plan that would cover his pre-existing condition after 24 months.

99.     The membership effective date for Mr. Willard and his family was March 1, 2018, and they received what they believed was an insurance card showing they had hospital, in-patient, out-patient, emergency room, specialty visit, preventive, and X-ray and imaging, with certain co-pays and a $5,000 MSRA. Appendix N.

100.    Before enrolling with Aliera and Unity, Mr. Willard reviewed a "sell sheet" provided by Aliera. Appendix E. Just as ACA health insurance plans have gold, silver, and bronze tiers of coverage, the sell sheet also listed tiers of coverage. In addition, under each tier of coverage the sell sheet provided further detailed information on the benefits it offered and their terms. For example, the "AlieraCare 5000 – Premium" level of coverage stated that it offered 100% coverage for preventive care, five primary care visits per year with $20 consult fees, 100% coverage for x-rays and telemedicine, a $5,000 maximum for maternity benefits after a 10-month waiting period, and coverage for hospitalization and surgery. In addition, the tables on the third page of the sell sheet break down premiums by the age, with higher premiums for older members. The sell sheet included no mention of matching Aliera or Unity participants with financial, medical, or physical needs with participants who choose to assist with those needs, nor did it indicate that contributing amounts of money to cover the needs of other participants was optional.

101.    Mr. Willard only received a Member Guide from Aliera/Unity after filling out the enrollment form and making the initial payment.

102.    Their membership enrollment form did not disclose that they would be obligated to arbitrate disputes, nor did it include the notice required by KRS 304.1-120(7)(d)(2). Appendix O.

103.    In April 2019, Mr. Willard was advised by Aliera that his family's plan through Aliera/Unity was no longer available, but that he could change his plan to a new Aliera/Trinity plan with the same benefits and the same monthly contribution amount as the Aliera/Unity plan. Appendix P. Aliera, for itself and as agent for Trinity, led the Willards to believe that existing claims would transfer to and be assumed by Trinity by representing that "all Medical history and historical claims" would "continue to track" after the Willards' plan was transferred to Aliera/Trinity. *Id.* The Willards agreed to switch to Trinity and they did not receive any materials disclosing that they would be obligated to arbitrate any disputes before agreeing to make the switch to Trinity and receiving confirmation from Aliera that it had been effective. Appendix Q. After he switched to Trinity, Mr. Willard received new insurance cards for TrinityCare Everyday Premium, reflecting an effective date of June 15, 2019. The card falsely stated that he and his family were members of an HCSM "***recognized pursuant to 26 U.S.C. § 5000A(d)(2)(B)***" even though neither Trinity nor Aliera was ever certified or "recognized" by any government agency as an HCSM. Appendix R (emphasis added).

104.    The Willards paid $631.20 per month, through May 2019, for their AlieraCare Premium 5000 plan while Aliera partnered with Unity. Beginning in July 2019, they paid $736.75 per month for their TrinityCare Everyday Premium plan while Aliera partnered with Trinity.

105.    After Mr. Willard's 24-month waiting period for coverage of pre-existing conditions expired in March 2020, Mr. Willard attempted to submit bills for treatment related to his pre-existing condition, and they were denied by Aliera on the grounds that his specific treatments are not covered under any circumstances. In order to address any possible concerns

that his treatments were somehow cosmetic or related to pain management, Mr. Willard's neurologist wrote a letter to Aliera explaining the medical necessity of the treatments. Nonetheless, Aliera still refused to approve coverage for Mr. Willard's condition despite multiple calls to Aliera's customer service, including calls during which he spoke with purported Aliera supervisors.

106.    Mr. Willard submitted a formal written appeal on or about May 20, 2020.

107.    At the time that Mr. Willard submitted his appeal in May 2020, the "Dispute Resolution & Appeal" section of his TrinityCare Everyday Member Guide set out a two-tier appeals process. Appendix S, at 31-32. The first level of appeal simply required Mr. Willard to call Trinity HealthShare and request that the "member services team" resolve the issue. *Id.* at 32. The second level of appeal required an appeal in "writing, stating the elements of the disagreement and the relevant facts," and the Member Guide stated that an Internal Resolution Committee made up of three Trinity HealthShare officials would render a written decision within 30 days "unless additional medical documentation is required to make an accurate decision." *Id.*

108.    Although Mr. Willard completed both tiers of the appeal process, he has never received a written decision on his appeal, nor has he been asked for additional medical documentation.

109.    As a consequence, since securing insurance from Aliera in February 2018, Mr. Willard has never received any coverage or reimbursements from Aliera for the expensive quarterly treatments necessary to control his neurological condition.

110.    Since Mr. Willard secured insurance from Aliera in February 2018, Defendants have improperly rejected and refused to pay multiple other claims submitted by Mr. Willard and his family for health care, including thousands of dollars in claims resulting from the birth of their son earlier this year, Appendix I, despite Defendants promising to cover such medical expenses. In addition, Mr. Willard had to take advantage of a special COVID-19 relief program to obtain

temporary Medicaid coverage for his newborn son because he could not rely on Aliera to pay any of his bills.

111.   The AlieraCare Premium 5000 and TrinityCare Everyday Premium plans sold to the Willards constitute insurance under Kentucky law. However, the plans failed to comply with Kentucky and federal law in its provisions of benefits and falsely stated that they were "not insurance."

112.   At no point was Mr. Willard asked to "share" his "contributions" (monthly premium payment) to pay for other members' needs, nor was he told that any other members had agreed to "share" their "contribution" with him or his family.

113.   Mr. Willard and his family have suffered damages by paying for the Unity plan and Trinity plans, which are both illegal insurance products, and by being denied health care coverage for their needed medical expenses.

## VI.  CLAIMS FOR RELIEF

### A.   First Claim: Illegal Contract Against All Defendants

114.   Plaintiffs reallege all prior allegations as though fully stated herein.

115.   Defendants marketed, issued, delivered, and administered unauthorized and illegal health insurance plans in violation of Kentucky law to Plaintiffs and all members of the class, based on the following issues, among others:

(a)   The plans were insurance, *see supra* Section V.B-C, but were sold without authorization in Kentucky.

(b)   The plans failed to provide the required Essential Health Benefits and imposed waiting periods, excluded coverage for pre-existing conditions, and imposed caps in violation of the ACA. *See supra* Section V.C.

(c)   The Member Guides contain inconsistent and contradictory coverage terms and conditions that allow Defendants to arbitrarily deny coverage.

- 29 -

(d)     Defendants failed to maintain the medical loss ratio required under the ACA.

(e)     The plans failed to comply with legal requirements for a reasonable grievance and appeals process, and illegally required arbitration, which cannot be required in insurance contracts under Kentucky law.

116.    Plaintiff and all members of the proposed class are entitled to either (a) rescission of the illegal contract(s) and return of the insurance premiums paid; or (b) reformation of the illegal contract(s) to comply with the mandatory minimum benefits and coverage required under Kentucky and federal law.

**B.      Second Claim: Violation of Kentucky's Unfair Competition Law Against All Defendants**

117.    Plaintiffs reallege all prior allegations as though fully stated herein.

118.    Defendants' creation, marketing, advertising, sale, and administration of unauthorized health insurance plan(s) to class members are illegal under Kentucky's Insurance Code, KRS 304.12-010, et seq., because those acts constitute unfair methods of competition or unfair or deceptive acts or practices in the business of insurance.

119.    Defendants have committed unfair acts or practices that are deceptive or misleading or have the capacity to be deceptive or misleading. These acts or practices include, but are not limited to, the following:

(a)     Defendants have consistently represented that their health care products are "not insurance." This representation appears in the Member Guides, in advertising material, in training material, and on its webpages. This representation, however, is false. Under Kentucky law, Defendants offered unregulated insurance to members of the public. *See supra* Section V.B-C.

(b)     While claiming their products are "not insurance," Defendants have deceptively advertised and marketed their products as a viable substitute for insurance. Specifically, the advertisements and solicitations deceived or misled, or had the capacity

to deceive or mislead, members of the class into believing that they were purchasing a legitimate health insurance product. The look and feel of the advertising material suggest that the plans are the same as health insurance products, and their agents represented the products to be comparable to health insurance. Defendants have claimed their products are "not insurance," however, so that they can avoid state consumer protection and solvency regulation. By claiming their products are "not insurance," they have also avoided providing the minimal Essential Health Benefits required under the ACA. *See supra* Section V.C.

(c)     Defendants have advertised and represented that Unity and Trinity are each a "Health Care Sharing Ministry recognized pursuant to 26 U.S.C. § 5000A(d)(2)(B)." This is false. *See supra* Section V.A. These misrepresentations deceived consumers into believing that their health care plans were faith-based and would be administered in an ethical manner for the benefit of members, rather than for the benefit of for-profit Aliera.

(d)     While representing that Unity and Trinity each serve as a "neutral clearing house" for the payment of claims, Defendants have failed to disclose that only a fraction of the funds they receive as member contributions are paid out in claims, that the ACA requires that an insurer pay 80% of the premiums collected as benefits, or that for-profit Aliera takes most of the member contributions as fees, while arbitrarily deciding whether benefits should be paid. Consumers were led to believe that their premiums would primarily be used to pay claims of their plan's members. In fact, most of the contributions were used to pay Aliera and its owners.

(e)     Defendants have misrepresented that members' monthly contributions were put into a cost-sharing account with either Unity or Trinity, which "acts as an independent and neutral clearing house, dispersing [sic] monthly contributions as described in the membership instructions and guidelines." Appendix A, at 8; Appendix B, at 10. Defendants have misrepresented that either Unity or Trinity, which are ostensibly

nonprofits with "nothing to gain or lose financially by determining if a need is eligible or not," is the entity to whom members delegated coverage decision authority. Appendix A, at 10; Appendix B, at 13. In fact, contributions were not placed into a cost-sharing account with either Unity or Trinity, but rather were paid directly to for-profit Aliera which maintained complete control over payments for medical expenses and maintained exclusive access to and control over the Unity or Trinity membership list.

(f)     Defendants misrepresented that the reason the plans were cheaper than ACA-compliant plans was merely that they have higher deductibles, or "MSRAs." Appendix D, at 26. In fact, the reason the plans were cheaper is that Defendant Aliera asserted the unilateral discretion to, and did, arbitrarily deny claims.

(g)     Defendants Aliera and Trinity have claimed they have a "growing nationwide PPO network of more than 1,000,000 healthcare professionals and more than 6,000 facilities," Appendix A, at 7; Appendix B, at 9. Defendants provided lists of professionals and facilities, but then denied claims on the basis that those professionals and facilities were not in-network, or that the providers were charging too much.

(h)     Defendants systematically engage in unfair claims handling practices by arbitrarily denying claims. Even though Defendants represent that the coverage provisions are not legally binding upon them and that they are not legally obligated to pay claims, they then insist members are legally obligated to follow the multilevel Dispute Resolution Procedure outlined in the Member Guides. Appendix A, at 12-13; Appendix B, at 18-19. Defendants deceptively use the multilevel Procedure to subject members to Kafkaesque delays and false and inconsistent promises, to delay payment of legitimate claims, and to shield Defendants from legal action.

120.    Members of the public are and have been deceived by these unfair and unlawful practices.

121.     Aliera acted on its own behalf and as an express and apparent agent for Unity and Trinity, when it created, marketed, sold, and administered virtually identical plans under both the Unity and Trinity brands, and committed the above unfair and deceptive acts while acting for both entities.

122.     Plaintiffs and class members have been injured as a direct result of Defendants' conduct. They suffered economic injury by paying for unregulated insurance products that are illegal under Kentucky law. The products provided less coverage than permitted under law, thereby rendering the policies less valuable than products that do comply with the law. Plaintiff and class members have been denied care, or limited in care, due to illegal caps, exclusions, and limitations. Plaintiff and class members have foregone coverage under the ACA, including subsidized benefit packages that would provide legal, comprehensive, and secure health insurance coverage. Defendants' polices were overpriced for the coverage they purported to provide given that over 80% of the contributions were paid in fees and commissions, rather than to benefits, causing Plaintiff and class members to overpay for the illegal and unregulated policies. They purchased the products with the reasonable belief that their medical bills would be paid, but Defendants have devised excuses not to pay those claims or to unreasonably delay in payment of the claims.

**C.      Third Claim: Bad Faith and Violation of Kentucky's Unfair Claims Settlement Practices Act Against All Defendants.**

123.     Plaintiffs reallege all prior allegations as though fully stated herein.

124.     Defendants' management and handling of claims made by Plaintiffs and class members are illegal under Kentucky's Unfair Claims Settlement Practices Act, KRS 304.12-230, et seq., and constitute common-law bad faith.

125.     Defendants have systematically engaged in unfair claims handling practices by arbitrarily denying claims.

126.     Even though Defendants have represented that the coverage provisions are not legally binding upon them and that they are not legally obligated to pay claims, they have insisted

members are legally obligated to follow various multilevel Dispute Resolution Procedures outlined in the Member Guides and, at various times, required binding arbitration, in violation of the Kentucky Insurance Code, KRS 417.050. Appendix A, at 12-13; Appendix B, at 18-19. This burdensome Procedure was not disclosed to consumers in the marketing materials before they committed to enrolling in the plans. Defendants deceptively used the multilevel Procedure to subject members to Kafkaesque delays and false and inconsistent promises, to delay payment of legitimate claims, and to shield Defendants from legal action.

127.    In carrying out the above-described practices, Defendants misrepresented pertinent facts to the Plaintiffs and class members, failed to act reasonably promptly upon notice of claims and other communications by Plaintiffs and class members, failed to adopt and implement reasonable standards for the prompt investigation of claims arising under policies issued by the Defendants, refused to pay claims without conducting a reasonable investigation, failed to respond to claims within a reasonable time after proof has been submitted, did not attempt in good faith to effectuate settlement of valid claims that have been submitted, and/or failed to promptly provide a reasonable explanation of the basis for denial of claims.

128.    Plaintiffs and class members have been harmed by the acts described above.

129.    Aliera acted on its own behalf and as an express and apparent agent for Unity and Trinity in the administration of claims submitted by plan members, and when it denied said claims, in a manner which constitutes an unfair claims practice.

130.    Plaintiffs and class members have been injured as a direct result of Defendants' conduct. They suffered economic injury each time Aliera failed to pay a claim, delayed payment of a claim, or otherwise engaged in an unfair claims settlement practice. They purchased the products with the reasonable belief that their medical bills would be paid, but Defendants devised excuses not to pay those claims or to unreasonably delay in payment of the claims.

**D.    Fourth Claim: Violation of Kentucky's False Advertising Law Against All Defendants.**

131.    Plaintiffs reallege all prior allegations as though fully stated herein.

132.     Defendants have made false and/or misleading statements in advertisements directed to the public or a substantial number of persons in connection with the sale of services in Kentucky, in violation of KRS 517.030, with an intent to induce them to forego legitimate health insurance coverage and to purchase Defendants' sham insurance coverage instead. These false and/or misleading statements include:

(a)     Advertising and representing Unity and Trinity each as a "Health Care Sharing Ministry recognized pursuant to 26 U.S.C. § 5000A(d)(2)(B)."

(b)     Consistently and repeatedly misrepresenting that AlieraCare/Trinity and AlieraCare/Unity and their related products are "not insurance."

(c)     Misrepresenting that the health care plans they sold were like insurance but cheaper, or were a form of legitimate health care plan.

(d)     Misrepresenting the plans as a "sharing" program that provides members with a role in determining whether claims should be paid, when in fact all coverage decisions were made arbitrarily by Aliera and in Aliera's best interest.

(e)     Misrepresenting that Trinity and Unity, which are nonprofits with "nothing to gain or lose financially by determining if a need is eligible or not," are the entities to whom members delegated coverage decision authority.

(f)     Misrepresenting that Defendants provided coverage for medical expenses.

(g)     Misrepresenting that there are over 1,000,000 providers and 6,000 facilities within Defendants' PPO network, and then denying claims from those providers and facilities listed as included within the PPO network.

133.     Members of the public are and have been deceived by these unfair and unlawful practices.

134.     Plaintiffs and class members have been injured as a direct result of Defendants' conduct by paying for sham insurance products that did not provide either the benefits offered or that should have been offered under a legitimate health care plan. They have been further injured

when, as a direct result of Defendants' conduct, they lost the opportunity to enroll in legitimate health plans either during open enrollment or special enrollment periods. Therefore, they may recover damages from Defendants for their violations of KRS 517.030, as allowed by KRS 446.070.

      **E.**      **Fifth Claim: Breach of Fiduciary Duty – Aliera and Trinity**

135.    Plaintiffs reallege all prior allegations as though fully stated herein.

136.    Trinity and its exclusive agent Aliera have represented that members of Trinity "voluntarily submit monthly contributions into a cost-sharing account," and that Trinity "act[s] as a neutral clearing house between members." Appendix B, at 10. While disclaiming that there is any legally binding agreement to reimburse members for medical needs, those Defendants have claimed Trinity will serve as the "neutral" intermediary to allow its members to share "voluntary" contributions with one another in accordance with "the membership instructions." *Id.* at 10.

137.    Aliera and Trinity have further represented their trustworthiness by claiming Trinity is a "faith based" or religious organization.

138.    Aliera and Trinity have represented that "since Trinity HealthShare has nothing to gain or lose financially by determining if a need is eligible or not, the contributor designates Trinity HealthShare as the final authority for the interpretation of these guidelines." *Id.* at 13.

139.    Defendants have exercised complete control over the financial "contributions" that Trinity members pay, and complete control over the coverage decisions.

140.    As a result of these representations and their control over Trinity members' "contributions," Defendants owe a fiduciary duty to those members.

141.    Aliera has admitted in court filings and testimony that it has a fiduciary duty to Trinity members.

142.    Aliera and Trinity are insurers. Under Kentucky law, insurers have a duty to exercise the "utmost good faith." *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 280 (Ky. 1991).

143.     Aliera and Trinity have breached their fiduciary duty. Trinity has delegated sole control of its members' funds, and all coverage decisions, to for-profit Aliera, which has commingled those members' funds with other funds. Coverage decisions were made solely by for-profit Aliera, and in order to secure its profits, it decided not to provide coverage for members' medical needs. As a consequence, Plaintiffs and class members have been arbitrarily denied claims for medical expenses in order to enrich Defendants.

144.     On information and belief, approximately 84% of the contributions made by member were paid to Aliera in the form of fees and administrative expenses, rather than to cover the medical needs of those members.

145.     Plaintiffs and class members have been injured by Defendants' breaches of fiduciary duty. Funds that should have been used to pay their claims (including the claims of Unity enrollees who were induced to switch to Trinity based upon the representation that Trinity would be responsible for all past claims) have instead been used to enrich Defendants. Those excess payments to Defendants should be disgorged and held in constructive trust for the benefit of the Plaintiffs and class members.

F.     Sixth Claim: Breach of Fiduciary Duty – Aliera and Unity

146.     Plaintiffs reallege all prior allegations as though fully stated herein.

147.     Unity and its exclusive agent Aliera have represented that members of Unity voluntarily submit monthly contributions or gifts into an escrow account, and that Unity "acts as a neutral clearing house between members." Appendix A, at 4. While disclaiming that there is any legally binding agreement to reimburse Unity members for medical needs, Aliera and Unity have claimed Unity will serve as "a clearing house" distributing monthly contributions as described in the membership instructions and guidelines. *Id.* at 10.

148.     Aliera and Unity have further represented their trustworthiness by claiming Unity is "faith based" and based on a "tradition of mutual aid, neighborly assistance and burden sharing." *Id.* at 4, 8.

149.    Aliera and Unity have represented that "since Unity HealthShare has nothing to gain or lose financially by determining if a need is eligible or not, the contributor designates Unity HealthShare as the final authority for the interpretation of these guidelines." *Id.* at 10.

150.    Aliera and Unity have represented that monthly contributions are "voluntarily given" to Unity to hold as an escrow agent and to disburse "in accordance with the membership instructions." *Id.*

151.    Unity and its exclusive agent Aliera have exercised complete control over the financial "contributions" that Unity members pay, and complete control over the coverage decisions. *Id.*

152.    Based on these representations and their control over Unity members' "contributions," Aliera and Unity have a fiduciary duty to those members.

153.    Aliera has also admitted in court filings that it has a fiduciary duty to Unity members.

154.    Aliera and Unity are insurers. Under Kentucky law, insurers have a duty to exercise the "utmost good faith." James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co., 814 S.W.2d 273, 280 (Ky. 1991).

155.    Aliera and Unity have breached their fiduciary duty. Unity delegated sole control over its members' funds, and all coverage decisions, to for-profit Aliera, which has commingled members' funds with other funds. Coverage decisions were made solely by for-profit Aliera, and in order to secure its profits, it decided not to provide coverage for Unity members' medical needs. As a consequence, Plaintiffs and class members have been arbitrarily denied claims for medical expenses, and have been denied pre-authorization of needed medical care, in order to enrich Defendants.

156.    The majority of Unity member contributions were paid to Aliera in undisclosed fees, rather than to cover the medical needs of the members.

157.    Plaintiffs and class members have been injured by Aliera's and Unity's breaches of fiduciary duty. Funds that should have been used to pay Unity members' claims have instead been used to enrich those Defendants. Those profits should be disgorged and held in constructive trust for the benefit of the Plaintiffs and class members.

**G.      Seventh Claim: Unjust Enrichment Against Aliera**

158.    Plaintiffs reallege all prior allegations as though fully stated herein.

159.    Plaintiffs and class members paid substantial monthly contributions. On information and belief, approximately 84% of those monthly contributions were siphoned off as fees and expenses, largely to benefit Aliera and its principals.

160.    Plaintiffs and class members made their payments with the understanding that the funds would be used to pay the medical claims of Trinity or Unity members. They were never advised that a majority of those payments would actually be distributed to Aliera in the form of fees, administrative expenses, and commissions.

161.    Aliera has retained the contributions made by members of Trinity and Unity while arbitrarily denying their medical claims and, as a consequence, Aliera has been unjustly enriched at the expense of Plaintiffs and class members.

**VII.  PLAINTIFFS AND CLASS MEMBERS ARE ENTITLED TO RESTITUTION OF THE AMOUNT ALIERA UNJUSTLY RETAINED PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

(a)     Certify that this action may proceed as a class action as defined in ¶ 21 above;

(b)     Designate Hanna Albina and Austin Willard as class representatives, and designate Eleanor Hamburger and Richard E. Spoonemore, Sirianni Youtz Spoonemore Hamburger PLLC; William Anderson and George Farah, Handley Farah & Anderson; D. Todd Varellas and James J. Varellas III, Varellas & Varellas; and William R. Garmer and Jerome P. Prather, Garmer & Prather, PLLC, as class counsel;

(c)     Declare that Defendants' unauthorized health insurance plans were and are illegal contracts;

(d)     Declare that Defendants' actions as alleged herein towards the members of the class violate the unfair competition provision of Kentucky's Insurance Code, False Advertising Law, and Unfair Claims Settlement Practices Act;

(e)     Enjoin Defendants from denying and delaying payment of legitimate health care claims and disbursing monies in any amount that results in violation of the ACA's required ratio between medical expenses paid and premiums charged;

(f)     Order (i) rescission of the unauthorized health insurance plans and restitution of all premiums received from members of the class, including interest; or, at the option of any class member, (ii) reformation of the unauthorized health insurance plans to comply with the minimum mandatory benefits required under the relevant state insurance code and federal law, and permit class members to resubmit claims for medical services, costs, and other expenses that would have been covered;

(g)     Enter judgment in favor of Plaintiffs and the class on their breach of fiduciary duty claim, and impose a constructive trust for the benefit of the class on all amounts wrongfully retained;

(h)     Order disgorgement and restitution of all contributions Aliera unjustly retained;

(i)     Award punitive damages; and

(j)     Grant such other relief as this Court may deem just, equitable and proper.

Dated: December 11, 2020

Respectfully submitted,

William R. Garmer
Jerome P. Prather
GARMER & PRATHER, PLLC
141 North Broadway
Lexington, Kentucky 40507
Telephone: (859) 254-9351
Facsimile: (859) 233-9769

bgarmer@garmerprather.com
jprather@garmerprather.com

James J. Varellas III
D. Todd Varellas
Varellas & Varellas
249 West Short Street
Suite 201
Lexington, KY 40507
Tel: (859) 252-4473
Facsimile: (859) 252-4476
jayvarellas@varellaslaw.com
tvarellas@varellaslaw.com

Richard E. Spoonemore (to apply *pro hac vice*)
Eleanor Hamburger (to apply *pro hac vice*)
SIRIANNI YOUTZ SPOONEMORE HAMBURGER PLLC
3101 Western Avenue, Suite 350
Seattle, WA 98121
Tel.: (206) 223-0303
Facsimile: (206) 223-0246
rspoonemore@sylaw.com
ehamburger@sylaw.com

William H. Anderson (to apply *pro hac vice*)
Handley Farah & Anderson PLLC
4730 Table Mesa Drive
Suite G-200
Boulder, CO 80305
Tel: (303) 800-9109
Facsimile: (844) 300-1952
wanderson@hfajustice.com

George Farah (to apply *pro hac vice*)
Rebecca P. Chang (to apply *pro hac vice*)
Handley Farah & Anderson PLLC
81 Prospect Street
Brooklyn, NY 11201
Tel: (212) 477-8090
Facsimile: (844) 300-1952
gfarah@hfajustice.com
rchang@hfajustice.com

*Attorneys for Plaintiffs and the putative Class*

/s/  Jerome P. Prather
JEROME P. PRATHER